Sandra Joan Fink HANOVER,
Defendant/Appellant,

v.

Jerome Howard HANOVER,
Plaintiff/Appellee.

Court of Appeals of Tennessee,
Western Section, at Jackson.

March 14, 1989.

Permission to Appeal Denied by
Supreme Court June 5, 1989.

David E. Caywood, Memphis, Picard & Caywood, for defendant/appellant.

Al H. Thomas, Memphis, Thomas & Thomas, for plaintiff/appellee.

McLEMORE, Special Judge.

Both parties in this divorce case have appealed. No issue is made to the action of the trial court in granting the divorce, but the parties sharply differ over the division of property rights, the amount of periodic alimony, and the award of attorney's fees.

Mr. Hanover filed his complaint for absolute divorce and alleged that Mrs. Hanover was guilty of cruel and inhuman treatment. Mr. Hanover later amended to charge Mrs. Hanover with adultery. Mrs. Hanover answered and filed a counter complaint for divorce, which was answered. After numerous pre-trial proceedings and a trial, the trial judge dismissed Mrs. Hanover's complaint, granted the divorce to Mr. Hanover on the grounds of cruel and inhuman treatment, divided the marital property, awarded Mrs. Hanover alimony *in futuro* and rehabilitative alimony, and awarded Mrs. Hanover a portion of the amount she had requested for attorney's fees.

Exclusive of certain articles of furniture, furnishings, art objects, jewelry and valuables, and items of a purely personal nature, the value of which the court made no determination, the trial judge found that the parties have marital assets and liabilities of which the values and equities were as set out in columns 1 and 2 below, and he divided these assets and liabilities as shown in columns 3 and 4:

| Assets | Column 1 Value | Column 2 Equity | Column 3 Mrs. Hanover | Column 4 Mr. Hanover |
|---|---|---|---|---|
| Cash on hand | $ 2,000 | $ 2,000 | $ 1,000 | $ 1,000 |
| Marital Home (ordered sold) | 215,000 | 125,572 | 62,786 | 62,786 |
| Bryton Towers (condo–equity) | 38,000 | 6,232 | 6,232 | –00– |
| Profit Sharing Pension | 177,478 | 177,478 | 44,369 | 133,109 |
| Limited Partnerships | 110,000 | 110,000 | –00– | 110,000 |
| Life Ins. Cash V. | 95,000 | 23,043 | –00– | 23,043 |
| Auto (Monte Carlo) | 1,500 | 1,500 | 1,500 | –00– |
| Auto (Renault) | 500 | 500 | –00– | 500 |
| Tax refund | 13,016 | 13,016 | –00– | 13,016 |
| Installments Receivable Given to Mr. Hanover by Grandfather | 48,488 | 48,488 | 14,495 | 28,990 |
| Liabilities: | | | | |
| Accounts Payable | (85,108.26) | | | (85,108.26) |
| Accounts & Notes Payable | (602,985) | | | (602,985) |

Mrs. Hanover received $130,382.00 of the above-listed assets excluding liabilities, and Mr. Hanover received $372,444.00 of the above-listed assets excluding liabilities. When the liabilities are added to Mr. Hanover, he has net liabilities of $315,649.26.

At the time of the divorce hearing, Mr. Hanover was sixty-one years of age and Mrs. Hanover was fifty-two years of age. The parties had been married thirty-one years and had six children, none of whom were minors. The date of separation was February 12, 1986. Mr. Hanover works for Union Realty, which falls under the "Belz Umbrella." Mr. Hanover works for his

brother-in-law, Jack Belz, who is married to Mr. Hanover's only sister. Mr. Hanover sits on the Board of Directors of some of the Belz companies. He considers himself to be a part of the Belz family, and both families are closely involved in business and social activities. Mrs. Hanover has been involved in these activities and Mr. Hanover considered her to be an asset. Mr. Hanover is highly productive and has the capacity to acquire future income and assets and has been responsible for the acquisition and appreciation of whatever marital assets the parties own.

Mrs. Hanover spent a great deal of her time rearing the parties' six children. She has no vocational skills, has approximately two years of college, has good mental and fairly good physical health, and was not a good prospect for employment at the time of the divorce. In January, 1987, Mrs. Hanover was diagnosed as having breast cancer and shortly thereafter had a mastectomy. Her doctor testified that as expected, her recovery has been good.

During the entire marriage the parties lived a very pleasant life. Mr. Hanover testified that for years they had lived beyond their income and that each year he had borrowed money from his business and from his brother-in-law to pay for living expenses and for other reasons. By 1978 he owed $173,000 in excess of the equity in partnerships that he owned with his brother-in-law. That year Mr. Belz and Mr. Hanover valued the properties owned by the partnerships, and Mr. Hanover transferred his interest to companies in which Mr. Belz owned interests. Mr. Hanover executed a note for the deficiency of $173,000.00. Mr. Hanover and Mr. Williams, the accountant for the Belz companies, testified that Mr. Hanover owed $291,798.00 at the end of 1979 and borrowed the following sums in the years shown from his brother-in-law or his companies and owed a total of $602,985.00 at time of trial:

| | |
|---|---|
| 1981 | 44,207.00 |
| 1982 | 29,100.00 |
| 1983 | 53,900.00 |
| 1984 | 48,900.00 |
| 1985 | 70,400.00 |
| 1986 | 42,940.00 |

Mr. Hanover contends that the trial court erred (1) in dividing the marital assets where there is no net marital estate, and (2) awarding Mrs. Hanover attorney's fees.

The thrust of Mr. Hanover's argument with respect to issue number one is that "the estate which is to be divided by the divorce Court is the *net* estate after payment of the debts which the husband has contracted." No Tennessee case has been cited in support of this argument, and we find no merit to this contention. Our statute T.C.A. § 36–4–121 provides for the equitable distribution of the marital estate and enumerates relevant factors that the trial court shall consider in making this equitable division. When, after the equitable division of the marital assets there remain obligations of the parties, the court has the discretion to order the payment of the obligations in such a manner that is just and equitable, considering the respective earning capacities of the spouses and the other relevant factors enumerated in the statute. The trial court specifically addressed this aspect in the division of the marital assets and also in consideration of the amount of alimony, as will hereafter be discussed in addressing the issues presented by Mrs. Hanover.

Mrs. Hanover has listed nine issues on appeal. She has grouped the first three together for argument, and we will add the fourth and deal with them together for disposition. These issues are stated as follows:

1. Did the trial court err in failing to equitably divide the marital property?
2. Did the trial court err in finding $602,985.00 was owed by Mr. Hanover to Union Realty Company?
3. Did the trial court err in not finding the marital estate contained a substantial credit due Mr. Hanover as a result of the 1978 transaction?
4. Did the trial court err in finding the limited partnerships were only worth $110,000.00?

Mrs. Hanover contended that the valuation placed upon the properties in 1978 by Mr. Hanover and Mr. Belz were understat-

ed, and that Mr. Hanover retains a secreted, concealed interest in the proceeds, and the transaction was in some way not straightforward and was a fraud. Her expert, who analyzed the transaction some nine years after the fact, theorized that the values were not accurate, relying primarily upon the fact that the values stated in a financial statement filed by Mr. Hanover in December 1977 were greatly in excess of the value agreed to by Mr. Hanover and Mr. Belz in 1978. He further theorized that the above loans were actually a line of credit arising out of the above transactions as no notes were signed for the loans and no demand for payment had been made.

At the time of trial, Mr. Hanover owned interests in certain limited partnerships, the values of which were sharply contested by Mrs. Hanover's expert and Mr. Hanover and Mr. Williams, the accountant for the Belz companies, and Mr. Belz.

The record in this case consists of nine volumes and the trial consumed the better part of seven days. Much of the proof had to do with the valuation of the foregoing assets. Mr. Hanover, Mr. Belz, and Mr. Jimmy Williams, Vice–President and Chief Financial Officer of Belz Investment Company, testified in great detail as to the transactions and the valuation of the assets. Mrs. Hanover and Mr. Garry Parrish, accountant, testified with respect to their ideas as to the transactions and valuations as to the assets. Though we have carefully examined this proof, we are of the opinion that only a cursory examination clearly shows that the proof preponderates in favor of the account given by Mr. Hanover and his witnesses.

Mrs. Hanover places great weight upon the financial statement filed by Mr. Hanover in 1977. Mr. Belz, in testifying as to the values put in the financial statement, said: "I would say if he put that in at that time, that would probably be the most hopeful and optimistic value that one could construe, if everything wonderful was to happen in the normal course of events that maybe that property would generate that, but that's not the way it happens in the real estate world."

Prior filed financial statements with respect to property value are evidence as to value, but this evidence cannot be construed to be the only evidence to be considered and binding in every case. These financial statements come in for what they are worth as evidence and are considered with all the other evidence in arriving at a preponderance of the proof.

Mr. Belz and Mr. Williams testified that it was not uncommon for executives of the Belz companies to be allowed to borrow on open account without signing notes, and the amounts borrowed by Mr. Hanover were *bona fide* debts and were due and payable in spite of the fact that no demand had been made by Mr. Belz for payment. There is no evidence to the contrary, and for the trial court to have found otherwise would be to ignore unimpeached witnesses.

The trial court in addressing the debts owed by the parties noted that the larger debt was a "result of loans made to Jerome Hanover over the years to cover the deficit spending by the parties in their extravagant lifestyle; that the entire family benefited from this extravagance and that both parties should be burdened with the satisfaction of the obligation; that although the debts exceed the net value of the assets, it would be inequitable and counter-productive to set off and assign all of the assets to satisfy the outstanding debts, especially when there has been no present demand for the repayment of the larger debt of $602,985.00; that only the husband is productive at this time and therefore should receive the bulk of the assets to offset the wife's inability to meet her share of this 'obligation.'" We are of the opinion that the evidence supports the findings of the trial court and his rationale.

Thus, we find no error in the judgment of the trial court with respect to issues two, three and four, and with issue number one as it relates to the foregoing assets.

Mrs. Hanover contends in issue number five that the trial court erred in including in the marital estate property that was her separate property.

The trial court, after making the division of property heretofore described above, stated:

> The parties own certain other articles of furniture, furnishings, art objects, jewelry and valuables, and items of a purely personal nature, the value of which the Court makes no determination. The Court finds that all of said property is "marital property", with the exception of property listed as belonging to third parties (the children). That the parties shall divide equally the articles of furniture, furnishings, art objects, and valuables and items of purely personal nature, and shall report every thirty (30) days on their progress in a satisfactory and agreeable division....

Mr. Hanover testified that he carried insurance on $100,000.00 worth of furniture and personal property, including jewelry and art objects in the amount of $190,-000.00. He further testified that he filed a list of these art objects and jewelry on the homeowner's policy of Jerome F. Hanover and Sandra Hanover at a value of $190,-000.00. He testified these values were replacement values and that the property would not bring this amount if sold.

Mrs. Hanover filed as an exhibit to her testimony, Trial Exhibit No. 30, consisting of ten legal-size pages. This exhibit lists as "Marital Property" forty-three items individually valued and totaled as having "Maximum Realistic Value" of $9,730.00. Page two lists twenty-six items under a heading of "Separate Property of Sandra Hanover, Gifts From Jerry." By each individual item is an explanation of the source of the item; e.g., "Mother's Day gift from Jerry," "gift from Jerry for an occasion in Dallas." The items, with minor exceptions, appear to be gift items. Pages three and four of the exhibit list sixty-two items under a heading of "Separate Property of Sandra Hanover, Sandy's Gifts from Third Parties." By each individual item is an explanation of the source of the item; e.g., "gift from Aunt Dolly for birthday." These listed items, with minor exceptions, appear to be gift items one might give to a loved friend. Page five contains a list of eighteen items under a heading of "Non–Marital Property, Possessions Belonging to Children." Page six is a list of thirty-nine items under a heading of "Jewelry and Valuable Objects, Marital Property," indicating an aggregate "Maximum Realistic Value" of $7,979.25. Pages seven and eight contain a list of twenty-eight items under a heading of "Separate Property of Sandra Hanover, Jewelry Items Given to Sandy by Jerry (Most as Special Occasion Gifts)," indicating a "Maximum Realistic Value" of $18,025.00. Most items are described as "special occasion, Christmas, or anniversary gifts." Page nine contains a list of eleven items under a heading of "Separate Property of Sandra Hanover, Jewelry Items Given by Friends and Relatives to Sandra Hanover." Page nine also contains a list of four "Items Given to Sandy but not by Jerry." The source is indicated by each item. Page ten consists of a list of twenty-two items under a heading of "Non–Marital Property, Jewelry Belonging to Others." These items appear to belong to Jerry or the children.

The exhibit was admitted into evidence. Mr. Hanover in rebuttal challenged the value of Mrs. Hanover's engagement ring, which she had valued at $2,800.00. He offered an appraisal of $15,000.00. Two other items were challenged in rebuttal to the exhibit. One was an "18K yellow gold frame set with 12 diamonds, full cut, weight approximately 0.40 cts and gold Russian medallion (Pavlova) [Sandy brought medallion from Russia. Mother paid to have it set the way Sandy wanted]." Mr. Hanover testified he paid for the medallion and for having it set. Mrs. Hanover testified her mother furnished the money.

The other item challenged was "Rosenthal Haarvey (gift) from Aunt Dolly for birthday" from the list on page three. Mr. Hanover testified that he paid for it. Mrs. Hanover testified that they were reimbursed by her aunt.

Mr. Hanover freely admitted making gifts to his wife for birthdays, Hanukkah, Christmas, Mother's Day and special occa-

sions, and that when he gave her jewelry the gift was clearly designed for her.

■ T.C.A. § 36–4–121(b)(2) defines "Separate Property" to mean "... and property acquired by a spouse at any time by gift, bequest, devise or descent."

■ The statute does not exclude spousal gifts from the definition. The matter to be determined where there are interspousal gifts is whether a gift actually occurred. Each case must stand on its own facts. A completed gift requires an intention to make a gift, delivery, and acceptance. As to delivery and acceptance of the items listed, there is little disagreement. Does the proof in this case preponderate in favor of an intention on the part of Mr. Hanover to make a gift to his wife? We think that it does. First, he has not unequivocally denied that he intended to make a gift of the items listed by Mrs. Hanover. He says that he listed them on his financial statement and their homeowner's insurance policy. With respect to the engagement ring, he disputes only its value, not the gift. With respect to the other two items, he contests who furnished the funds of purchase. Second, as is shown elsewhere in this opinion, these parties have maintained a standard of living that only the wealthy can afford. They have considered themselves in that category irrespective of the fact that they have lived far beyond their means.

Simply because the day of reckoning for the extravagance is at hand, we will not infer that Mr. Hanover did not intend to make a gift of all the items attributed to him, nor will we infer that the items listed as coming from others are marital property. The evidence preponderates to the contrary.

Accordingly, those items listed in Trial Exhibit 30 as gifts to "Sandy" or "Sandra" Hanover are separate property of Mrs. Hanover and will be excluded from the personalty to be divided equally between the parties pursuant to the judgment of the trial court.

Issues six, seven and eight all have to do with the amount of alimony Mrs. Hanover received, her ability to rehabilitate herself within three years, and the failure of the trial judge to require life insurance on the life of Mr. Hanover to secure the alimony payments in the event of his death.

The amount of alimony to be allowed in any case is a matter for the discretion of the trial court in view of the particular circumstances, for the appellate courts are disinclined to review such discretion except in cases where it has manifestly been abused. *Ingram v. Ingram,* 721 S.W.2d 262 (Tenn.App.1986).

■ Mrs. Hanover testified that her living expenses amounted to $7,000.00 per month.

The trial court awarded Mrs. Hanover the amount of $300.00 per week alimony *in futuro* and rehabilitative alimony in the amount of $200.00 per week for a period of three years. In making these awards, the court specifically noted that the factors specified in T.C.A. § 36–5–101 (order incorrectly states the code section as 36–4–101) were considered. In doing so, he, of course, considered fault as to the breakup of the marriage and the substantial debts ($688,093.26) owed, as well as the extravagant lifestyle indulged in by the parties resulting in the outstanding loans by Mr. Hanover, which liquidation will severely impair his ability to make alimony payments. As to rehabilitation of Mrs. Hanover, the trial court had the opportunity to observe Mrs. Hanover, review the conditions of her health and evaluate her possibilities for the future. We cannot say that the evidence preponderates against his findings.

■ The record discloses that Mr. Hanover is highly productive. His 1985 Tax Return shows that he had a total income of $146,740.00 and a taxable income of $67,699.00. Included in this income is a salary of $1,192.00 per week. When this income and the respective ages of the parties are considered, we are of the opinion that the trial court should have required Mr. Hanover to carry insurance on his life payable to Mrs. Hanover that would insure the payment of the alimony payments.

Mrs. Hanover's issue number nine deals with the amount of attorney's fee allowed by the trial court. The trial court allowed the sum of $17,300.00 attorney's fee as opposed to Mrs. Hanover's request for $31,014.20 after stating that Mrs. Hanover lacks sufficient cash or other assets readily convertible to cash in order to pay her attorney or other litigation expenses, and that Mr. Hanover has paid his attorneys and litigation expenses throughout the proceedings with cash obtained from the parties' marital assets, and it is fair and reasonable that Mr. Hanover should pay to Mrs. Hanover the foregoing amount. Affidavits were filed in support of the amount asked by Mrs. Hanover. However, it is well settled that the trial judge is not bound by the attorney's estimate or affidavits of other lawyers as to the amount of attorney's fees he shall allow as alimony. The award of attorney's fees is left largely to the discretion of the trial court, and this Court will not interfere with the trial court's decision except where there is a clear showing that the trial court reached the wrong conclusion with the result that manifest injustice will be done if the decision is allowed to stand. *Butler v. Butler,* 680 S.W.2d 467 (Tenn.App.1984). We find no abuse of discretion.

The judgment of the trial court is modified:

(1) so as to award to Mrs. Hanover as her separate property those items listed in Trial Exhibit 30 as gifts to "Sandy" or "Sandra" Hanover and these items will be excluded from the personalty to be divided equally between the parties pursuant to the judgment of the trial court.

(2) So as to require Mr. Hanover to keep in effect insurance upon his life payable to Mrs. Hanover so as to insure the alimony payments.

The case is remanded to the trial court to determine the amount of insurance necessary to comply with modification number two above and for such other proceedings as may be required.

Except as modified, the judgment of the trial court is in all respects affirmed.

Each of the parties is taxed with one-half of the costs in this Court, for which let execution issue, if necessary.

TOMLIN, P.J. (W.S.), and FARMER, J., concur.